## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

MONTRELL OLIVER

              Plaintiff,

    v.

CITY OF PHILADELPHIA, and
DETECTIVE TIM BASS,
DETECTIVE WILLIAM GROSS,
DETECTIVE RICHARD HARRIS, and
DETECTIVE RICHARD BOVA,
in their individual capacities

              Defendants.

CIVIL ACTION

NO. _____


**COMPLAINT**

---

Plaintiff, Montrell Oliver, by and through his attorneys, the Marrone Law Firm, LLC, hereby alleges as follows:

## INTRODUCTION

1.    When Montell Oliver was just seventeen years old he was arrested and then convicted for a crime he did not commit. Over the next twenty-six years he fought for his innocence, knowing that the evidence against him had been fabricated and coerced by corrupt detectives from the Philadelphia Police Department ("PPD"). He was arrested in 1998 and remained imprisoned until a change in how minors are permitted to be sentenced resulted in Oliver being released in 2022 and placed on lifetime parole. Even though he had escaped from the horror of incarceration, he was still not free, and he was still determined to clear his name. He continued to pursue his exoneration in the Court by means of a Petition for Issuance of a Writ of Habeas Corpus. Based on overwhelming evidence of actual innocence, the Philadelphia District Attorney's Office ("DAO") urged the Court to vacate Mr. Oliver's conviction, even

though he was already out of jail. On June 13, 2024, after a quarter century of being wrongfully imprisoned, and another two years of the indignity of parole, Montrell Wallace was finally and truly free.

2.      The wrongful conviction of Montrell Oliver was procured through the use of fabricated and suppressed evidence. PPD homicide detectives, including the defendants named herein, obtained statements from Marcus Best and Khalif Goldwire that were filled with false and fabricated information that was known to be false at the time the statements were taken. Goldwire long ago recanted and described how he was coerced by Detectives Gross and Bass into implicating Mr. Oliver. Marcus Best's statement and testimony has always been known by police to be false. Mr. Best implicated Oliver and a man named Jimmy Whitney as having committed this homicide. The PPD always knew that Best was lying because Jimmy Whitney was incarcerated at the time of the homicide leading to Mr. Oliver's wrongful conviction. PPD homicide detectives who are named as defendants in this matter suppressed the fact that Whitney was incapable of being involved because he was in jail.

3.      The evidence that helped establish Mr. Oliver's actual innocence was always known to the PPD and the Defendants herein. Mr. Oliver was arrested within twenty-four hours of the homicide. Although he was a minor, he was interrogated by police without any parent or guardian present. Oliver provided truthful information about his whereabouts and gave information about witnesses who could corroborate his actual innocence. One of those witnesses was June Bell. The PPD detectives who are defendants in this lawsuit got information about June Bell from Montrell Oliver and then used that information to threaten and intimidate June Bell so that she would not testify at trial. Decades later, June Bell's affidavit supporting Mr. Oliver's innocence was a portion of the evidence used to exonerate Oliver in 2024.

4.      Montrell Oliver now brings this civil rights lawsuit seeking compensation for the twenty-four years he spent in state prison for a crime he did not commit, and then for two additional years during which he continued to fight to clear his name. Without the corrupt and unconstitutional conduct of the individual defendants, as described in greater detail below, Mr. Oliver would never have been arrested, let alone convicted. Further, the unconstitutional conduct of the individual defendants was part of a larger pattern and practice within the City of Philadelphia whereby PPD detectives were implicitly authorized and encouraged to use unconstitutional means to make arrests and help secure convictions for homicides.

## JURISDICTION AND VENUE

5.      This action is brought pursuant to 42 U.S. § 1983 to redress the deprivation under color of law of the Plaintiff's rights as secured by the United States Constitution. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

6.      This Court has supplemental jurisdictions over the plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

7.      Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) in that this is the District in which the claims arose.

## JURY DEMAND

8.      Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

9.      Plaintiff **Montrell Oliver** is, and at all times relevant to this Complaint was, a resident of Pennsylvania. Mr. Oliver was born in 1979. On February 17, 1997, he was wrongfully arrested, and later wrongfully convicted, of the murder of Juakeem Bates. As a result, Mr. Oliver spent more than 24 years in prison until evidence of his actual innocence and of the PPD's unconstitutional conduct provided a basis for Oliver to have his conviction vacated in 2024, after which the DAO asked the court to *nolle pros* all charges.

10.      Defendant **City of Philadelphia** is, and at all times relevant to this Complaint was, a municipality located in the State of Pennsylvania. The City of Philadelphia was, at all times relevant to this Complaint, officially responsible for the policies, practices and customs of the Philadelphia Police Department (PPD), and was the employer of the individual PPD Defendants in this matter.

11.      Defendant **Tim Bass**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. Upon information and belief, Bass was assigned as a detective with the Homicide Unit at the time of this investigation.

12.      Defendant **William Gross**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. Upon information and belief, Gross was assigned as a detective with the Homicide Unit at the time of this investigation.

13.     Defendant **Richard Harris**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. Upon information and belief, Harris was assigned as a detective with the Homicide Unit at the time of this investigation.

14.     Defendant **Richard Bova**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. Upon information and belief, Bova was assigned as a detective with the Homicide Unit at the time of this investigation.

15.     Defendants Bass, Gross, Witcher and Strom are collectively referred to herein as "Individual Defendants."

16.     At all times relevant to this Complaint, the Individual Defendants named above acted in concert and in conspiracy with one another in order to deprive Mr. Oliver of his constitutionally protected rights.


**<u>OPERATIVE FACTS</u>**

17.     On the evening of February 16, 1997, Juakeim Bates, Johann Weldon and Larry Smith drove into Philadelphia from Norristown to party and buy drugs. They had over three thousand dollars in cash on them.

18.     Omar Goldwire, who would later become Montrell Oliver's co-defendant, met Bates and the other two other men at a gas station in West Philadelphia after 11 p.m. N.T. 2/6/98

at 75, 131, 147-49.  Omar[1] and Bates knew each other, and Omar offered to help the men buy

drugs.  N.T. 2/6/98 at 76-78.  The men followed Omar to his house in Mantua, where Omar

dropped off his car, then rode with the men around the block.  N.T. 2/6/98 at 78-86, 151-54.

    19.    Omar and Bates knocked on the doors of two houses in an unsuccessful effort to

get drugs.  N.T. 2/6/98 at 86-87, 156-57.  Omar then began talking with an unknown male while

Bates began walking back to the car.  N.T. 2/6/98 at 88-89, 157-58.

    20.    As Bates was returning to the car, a man with a shotgun approached the car,

apparently demanded money, and started shooting at Bates and the other men.  N.T. 2/6/98 at 88,

159.  Omar then also started shooting at the car.  N.T. 2/6/98 at 94-95, 160-62.[2]

    21.    Bates sustained a gunshot wound to the chest, and he was taken to the Hospital of

the University of Pennsylvania, where he was pronounced dead.  N.T. 2/6/98 at 162-63; N.T.

2/10/98 at 8, 23.

    22.    Based on a description of Omar Goldwire's car, the police located Omar at a

Girard Avenue gas station about 45 minutes after the murder.  N.T. 2/6/98 at 166-67; N.T. 2/9/98

at 32-34.  At the time, Omar was with his brother Khalif Goldwire and Khalif's best friend

Marcus Best.  N.T. 2/9/98 at 32-34.  Police arrested Omar on an unrelated robbery warrant and

allowed Khalif and Best to leave.  N.T. 2/9/98 at 33-34.

    23.    Some 17 hours later, police interviewed Khalif and Best.  N.T. 2/9/98 at 34-35.  At

that time, both men implicated Oliver and a third person in the homicide.  *See* N.T. 2/8/98 at 17-

---

[1] Petitioner refers to Omar by his first name to avoid confusion with the other Goldwire family members involved in the case.

[2] Eyewitness Ricky Smith testified to a slightly different version of the incident.  Smith stated that two armed men approached the car, while Omar was also present with a handgun.  N.T. 2/6/98 at 16-20, 23-27.  Smith said he did not see Omar fire a gun.  *See* N.T. 2/6/98 at 26, 39-40.

19; N.T. 3/26/97 at 108.  Best identified the third person as a man named Jimmy, and Khalif

claimed that he did not know the third person.  *See* N.T. 2/8/98 at 17-19; N.T. 3/26/97 at 108.

Based on these statements, Oliver was arrested the following day.  *See* N.T. 2/8/98 at 159-61.

This statement by Marcus Best was taken by Individual Defendant Detective Gross.

24.     Khalif disavowed his police statement at the preliminary hearing and did not

testify at trial.  N.T. 3/26/97 at 96, 100-01, 103, 109-18.

25.     At trial, the Commonwealth presented substantial evidence against Omar

Goldwire and little evidence against Montrell Oliver.  The two passengers in Bates's car

implicated Omar, but neither identified Oliver.  N.T. 2/6/98 at 94-95, 160-62.  Omar also made a

statement to the police that placed him at the scene of the homicide, although he claimed that he

did not participate.  N.T. 2/8/98 at 102-22.

26.     The only witness who implicated Oliver at trial was Marcus Best, who testified

that he was at the Goldwire house with Khalif Goldwire at the time of the murder.

27.     Throughout these proceedings, Oliver has maintained his innocence.  At trial,

Oliver argued that he did not match the description of the shooters and that he was not present at

the time of the homicide.  N.T. 2/11/98 at 10-12.  In fact, Ricky Smith, an eyewitness called by

the Commonwealth, testified that Oliver was not one of the shooters.  N.T. 2/6/98 at 36, 57-58,

63.  In the defense case, Oliver called Khalif's sister, Monique Goldwire, who testified that

Oliver was not at the Goldwire house on the night of the murder.  N.T. 2/10/98 at 48.  In further

support, Oliver's trial attorney suggested that Best and Khalif were responsible for Bates's

murder and that Best lacked credibility because of his prior criminal record and because he

hoped for leniency in an open case.  N.T. 2/11/98 at 13-25.

28.     After nearly three days of deliberations, more than a half-dozen questions, and the read-back of testimony from three witnesses, including Best, the jury convicted Oliver and Omar of all the charges.  N.T. 2/12/98 at 2-5; N.T. 2/16/98 at 2-11; N.T. 2/17/98 at 3-13.  Oliver did not testify during the guilt phase of his capital trial, but he testified during the penalty phase, providing a detailed account of his whereabouts on the night of the homicide.  N.T. 2/16/98 at 65-66.  In his testimony, Oliver stated that he spent the night with June Bell.  *See* N.T. 2/16/98 at 65-66.  Oliver also denied any participation in the homicide: "I'm innocent," he said.  "I ain't do nothing.  I ain't even killed.  I don't even play with no guns.  I ain't even into that."  N.T. 2/16/98 at 66-67.

29.     Montrell Oliver has always maintained that he spent the night of Bates's murder at Duane Napper's apartment on Spring Garden Street.  Alibi witness June Bell would have testified that she was with Oliver at the time of the murder and that the two spent the night at Napper's apartment.

30.     June Bell was threatened by the individual Defendants so that she would not come forward to confirm Mr. Oliver's innocence.

31.      Jadean Whitmore, who lived across the street from where the murder took place and who was Oliver's girlfriend at the time, would have corroborated Bell's testimony.  Whitmore would have testified that Oliver left her house with Bell on the night of the murder and did not return until around 11:00 a.m. the following day.

32.     Duane Napper provided a July 1998 statement to a private post-conviction investigator confirming Oliver's alibi.

33.     Shallom Roberts gave a statement to police on February 19, 1997, in which he said that, on the night of Bates's murder, he heard shots, saw two men run into the Goldwire

house, and then saw Omar enter the Goldwire house shortly thereafter. He told police he could not identify the two men who first went into the house. In 2018, Roberts provided an affidavit stating that he was familiar with Oliver and was certain that Oliver was not one of the two men that ran into the Goldwire house because of the large and unique shape of Oliver's head. Oliver's nickname, used throughout the trial, is "Hoagie Head." Roberts did not testify at trial.

34. The record shows that Marcus Best testified falsely and that the Commonwealth knew that Best's testimony was false. Best claimed that a man named Jimmy participated in the murder. Although Best identified Jimmy only by his first name, during the trial's penalty phase, the prosecutor asked Omar's mother, Thelma Goldwire, about prior robberies that Omar had committed with Jimmy Whitney, and Thelma replied that Jimmy Whitney was incarcerated at the time of Bates's murder. The relevant portion of Thelma's testimony is quoted below and is attached to this filing. Attachment F (trial transcript excerpt). Whitney, who was also known as James Hall, was incarcerated at SCI Houtzdale at the time and his court docket and a Department of Corrections (DOC) document show this.

35. The fact that Best implicated someone who was in prison undermines (1) his account to police that led to Oliver's arrest, and (2) his trial testimony that, as noted above, was the only evidence presented to the jury linking Oliver to the crime. In addition, the Commonwealth never sought to charge Whitney or a third person with Bates's murder.

36. In 2010, Omar Goldwire filed a pro se Post Conviction Relief Act petition attaching an affidavit from Khalif Goldwire. In that affidavit, Khalif stated that his 1997 police statement implicating Montrell Oliver was a lie and that Oliver was not at the Goldwire house on the night of Bates's murder.

37.     Khalif Goldwire and Marcus Best likely committed this crime with Omar Goldwire and blamed Oliver to avoid prosecution.  Although Oliver's attorney suggested this theory to the jury, he failed to present adequate support.  Whitney has explained to Oliver's investigator that Whitney hung out with Omar, Khalif, and Best and that Oliver was not part of their group.

38.     Whitney further explained that Omar would set up robberies and use Whitney, Best, and Khalif to assist him.  Court records corroborate that Omar, Khalif, and Whitney committed a prior staged robbery together where, as in the case at bar, Omar set up the victim. Although charges against Whitney for that case were dropped, Whitney was arrested in the matter after Best, as in the case at bar, informed police of Whitney's involvement.

39.     Khalif Goldwire and Marcus Best provided unreliable accounts of Bates's murder to the police, as demonstrated by the fact that the other person Best had implicated, Jimmy Whitney, was incarcerated at the time of the crime.  The record and additional investigation indicate that Khalif and Best were Omar Goldwire's co-conspirators and thus had reason to implicate Oliver. Moreover, the testimony of Oliver's alibi witnesses and of eyewitness Shallom Roberts would have supported the trial testimony of Monique Goldwire and eyewitness Ricky Smith that Oliver was not involved in the shooting. Finally, Oliver's participation in the above crimes is inherently improbable.  He had no prior record of violent criminal conduct, and, contrary to Best's testimony at trial, he was not close friends with Omar Goldwire.

40.     At all relevant times, the investigation into Bates' homicide was assigned to Defendant Detective Richard Harris. He participated fully in all aspects of the investigation, including the statements of Best and Khlaif, as well as the threatening of June Bell and the concealment of his own prior acts of misconduct.

41.     At all relevant times, Defendant Detective Richard Bova played a primary role in the Bates homicide investigation. He participated fully in all aspects of the investigation, including the statements of Best and Khlaif, as well as the threatening of June Bell and the concealment of his own prior acts of misconduct

42.     The conduct of all of the named Individual Defendants was undertaken with deliberate indifference to and in violation of the constitutional rights of the Plaintiff Montrell Oliver and contributed to his wrongful arrest, prosecution, conviction and imprisonment.

## Policies and Practices in the City of Philadelphia

43.     The Philadelphia Police Department's pattern and practice of unconstitutional misconduct in homicide investigations, including the coercion of confessions and suggestion of false statements from witnesses, and the suppression of exculpatory and inconsistent evidence dates back to at least the 1970's and continued beyond the timeframe that the individual Defendants investigated and prosecuted Mr. Oliver.

44.     From at least the 1970's, and continuing well beyond the timeframe that the individual Defendants investigated and prosecuted Mr. Oliver, the City of Philadelphia had in force and effect policies, practices, and customs of unconstitutional misconduct in homicide investigations, including but not limited to using coercive techniques in interviews to obtain false and misleading statements from witnesses, fabricating inculpatory statements from witnesses and evidence, coercing and suggesting false identifications of suspects through the use of unconstitutional identification procedures, withholding exculpatory and inconsistent evidence, ignoring eyewitness interviews, and fabricating incriminating statements from witnesses by feeding details about the crime to the witnesses.

45.     At the time of the investigation and prosecution of Mr. Oliver, the Philadelphia Police Department had a policy, practice, or custom involving the use of various techniques to make false statements by witnesses appear true and reliable, including but not limited to: providing a witness with details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication; taking misleading investigative steps to make statements appear more credible; selectively documenting witness statements and not the preceding interrogation, interview, preparation, or rehearsal; selectively recording witness' interviews; and misrepresenting that a suspect's formal statement was a verbatim statement in the suspect's own words, even when paraphrased or altered.

46.     At the time of the investigation and prosecution of Mr. Oliver, the Philadelphia Police Department had a policy, practice, or custom involving the use of various techniques to coerce false statements, including but not limited to: subjecting witnesses to needlessly prolonged interrogations and interviews; isolation; making promises, regardless of their truthfulness; threatening charges for unrelated misconduct; offering assistance in unrelated criminal matters, including pending or recently dismissed criminal charges; interviewing witnesses while they are under the influence of mind-altering narcotics that made them more susceptible to coercion and the drugs' mind-altering effects; and asserting that the witness will benefit in some way from making a statement that assists the police, and suffer some sort of disadvantage if they do not assist.

47.     At the time of the investigation and prosecution of Mr. Oliver, the Philadelphia Police Department had a policy, practice, or custom involving the use of various techniques to suppress or withhold exculpatory or inconsistent statements and evidence, in violation of their known duty under *Brady*, including but not limited to: making false statements to prosecutors

about the existence of evidence; failing to provide complete homicide files to prosecutors; coercing witnesses into keeping exculpatory and inconsistent information from prosecutors; refusing to testify at trial; discarding or deleting exculpatory and inconsistent information from homicide files; ignoring exculpatory and inconsistent information so that there is no record to be deleted from homicide files; farming out portions of Homicide investigations to police officers outside the Homicide Unit or other detectives assigned to the Homicide Unit so as to maintain a lack of evidence of their participation; and threatening witnesses in possession of exculpatory and inconsistent information to prevent them from coming forward to prosecutors or testifying.

48.     Furthermore, at the time of the investigation and prosecution of Mr. Oliver, the Philadelphia District Attorney's office had a policy, practice, or custom of withholding exculpatory or inconsistent statements and evidence, in violation of their known duty under *Brady*, including but not limited to: making false statements about the existence of evidence; allowing witnesses to provide false testimony; discarding or deleting exculpatory and inconsistent information from their files; ignoring exculpatory and inconsistent information so that there is no record to be deleted from their files.

49.     At the time of the investigation and prosecution of Mr. Oliver's case, the Philadelphia Police Department had a policy, practice, or custom of detaining, arresting, threatening, and interrogating purported witnesses in criminal investigations without legal cause and with the intent of coercing statements from these persons, under threat of punishment or other sanctions, or for material benefits.  These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel.

50.     At the time of the investigation and prosecution of Mr. Oliver's case, the Philadelphia Police Department had a policy, practice, or custom of maintaining a deliberately

biased Internal Affairs Division that exonerated police officers and detectives, including

Homicide Detectives, regardless of the evidence of misconduct.

51.     At the time of the investigation and prosecution of Mr. Oliver's case, the

Philadelphia Police Department had a policy, practice, or custom involving the intentional use of

untruthful affidavits of probable cause to support arrest warrants that, in violation of their

constitutional duties, failed to recite the totality of circumstances, including exculpatory

information, and cited fabricated evidence, statements from coerced witnesses, omitted mention

of credible exculpatory witness statements, and mischaracterized the nature of unconstitutional

identifications.  The City of Philadelphia failed to train and supervise its officers and detectives

to deter or end this policy, practice, and custom.

52.     These practices are well-known to the City of Philadelphia and its policymakers

with respect to criminal investigations and prosecutions as a result of newspaper investigations,

including the Philadelphia Inquirer's Pulitzer Prize winning reporting in 1977-78, governmental

investigations, including the Philadelphia Police Department's 39th District Corruption Scandal

in the 1990's, complaints from the public, complaints from attorneys, complaints from

whistleblowers, prior litigation, including employment complaints to the EEOC, and internal

police investigations.

53.     The Philadelphia Police Department was deliberately indifferent to officers'

misconduct and credible complaints to the Police Department's internal compliance department

were disregarded.

54.     Various cases involving the exoneration of individuals accused of murder,

individuals yet to be exonerated, and individuals who were in fact guilty demonstrate that this

misconduct was pervasive within the City of Philadelphia in both the Police Department and

District Attorney's office both before and after it investigated and prosecuted Mr. Oliver, and, upon information and belief, the misconduct described in this Complaint was tacitly, if not expressly, permitted by, committed with, or deliberately ignored when committed in the presence of Homicide Unit, Philadelphia Police Department, and/or District Attorney supervisors.

55.    Convictions that later resulted in exonerations demonstrate the rampant patterns, practices, and customs of official misconduct within the City of Philadelphia Police Department and a prior administration of its District Attorney's Office:

a.    *Commonwealth v. Antonio Martinez* – This matter was investigated in 1985 and resulted in the exoneration of Mr. Martinez after more than 30 years of incarceration.  It was determined that during his 1990 trial the Philadelphia Police and District Attorney's withheld information in their files which were later determined to contain numerous pieces of evidence implicating another suspect in the murder, including an eyewitness who informed police that another individual committed the murders.;

b.    *Commonwealth v. Raymond Carter* – This matter, which was investigated from 1986 until his conviction in 1988, resulted in the exoneration of Mr. Carter after former police officer Thomas Ryan was indicted in February 1995 on federal corruption charges.  A Philadelphia judge ordered a new trial because the prosecution's star witness had been paid $500 by then-officer Ryan to testify against Carter.  The City of Philadelphia paid a "churchgoing grandmother" a significant settlement after she sued alleging Ryan helped frame her and send her to prison for 3 years.  In 1996, the Philadelphia Inquirer reported that Officer Jack Baird, who was Ryan's partner, fabricated evidence because Ryan wanted the overtime compensation often available to officers in murder investigations.

c.    *Commonwealth v. Messrs. Gilyard & Wells* – This matter, which was investigated in August 1995 and resulted in the exoneration of the defendants after periods of wrongful incarceration, involved the fabrication and coercion of witness statements, garnering of false identifications based on suggestive police behavior, the suppression of exculpatory evidence and the submission of untruthful affidavits of probable cause when seeking arrest warrants.;

d.    *Commonwealth v. Donald Ray Adams* – Mr. Adams' case was investigated beginning in 1990 until his conviction in 1992.  Police ignored the physical description of the suspect provided by numerous eyewitnesses and instead opted to pressure and coerce an eyewitness with a crack cocaine addiction and criminal history.  Mr. Adams' was eventually granted a new trial and a jury returned a

verdict of not guilty in 2011.;

e.  *Commonwealth v. Jimmy Dennis* – Mr. Dennis' case was investigated from 1991 until he was sentenced to death in 1992. Nearly 25 years later, the United States Court of Appeals for the Third Circuit, sitting *en banc* vacated Mr. Dennis' conviction, holding that constitutional violations by Philadelphia Police Department Homicide detectives had undermined the fairness of Mr. Dennis' trial. Philadelphia Police Department Homicide detectives coerced witnesses, fabricated evidence, engaged in deliberate deception by concealing and suppressing material evidence, employed unlawful investigate techniques, presented false testimony, and denied Mr. Dennis due process of law and a fair trial.;

f.  *Commonwealth v. Percy St. George* – Mr. St. George's case was investigated from 1993 until 1994.  A Philadelphia Police Department Homicide Detective obtained a statement from a man who signed another person's name because of his fugitive status. As the trial approached, the Homicide Detective coerced the person whose named appeared in the signature to provide and sign a fabricated statement and to falsely identify Mr. St. George from an overly suggestive sham photo array. Upon further investigation, evidence suggested the homicide detectives coerced the witnesses into providing false statements and false identifications. The Detectives pleaded their Fifth Amendment right against self-incrimination rather than testify as to how they obtained the statements and identification.; and

g.  *Commonwealth v. Andrew Swainson* – In 1989, Andrew Swainson was convicted of murder on the statement of a single eyewitness, Paul Presley. Presley was an original suspect arrested for the shooting moments after it occurred, covered in blood and running from the scene at 3:40 a.m.  The prosecution dropped charges against Presley three weeks later.  Det. Santiago soon took a statement from Presley.  Presley explained Det. Santiago's tactics: Presley had not seen Swainson at the time of the shooting, and only knew what he looked like because he'd been shown his picture by Det. Santiago.  Rather than showing Presley a real photo array, *all seven photos that Det. Santiago showed Presley were of Swainson*. Presley explained that he only testified against Presley because he was coerced with threats of being charged for a separate drug crime.  (Presley was charged under a different name, and the Commonwealth never disclosed the matter Commonwealth v. Kareem Miller, DC No. 881855934; CP-51-CR-1024751, to Mr. Swainson.) Mr. Swainson was exonerated in 2020.

h.  *Commonwealth v. Onyiah* – Following a 2010 homicide, Detectives Pitts and Jenkins used coercive means to fabricate evidence and obtain a false confession in a case where surveillance video confirmed that the confession was false and that Onyiah could not have committed the crime. That conviction was later overturned and forms the basis for Detective Pitts' pending criminal trial.

i.  *Commonwealth v. Jamaal Simmons* – In 2012 Jamaal Simmons was convicted for the 2009 murder of Rodney Barnes. That conviction was overturned based on Nordo's having coerced two witnesses into making false statements.

j.  *Commonwealth v. Frazier* – When 19-year-old James Frazier was brought in to the PAB by Nordo for questioning related to a homicide, Nordo threatened to sexually assault him if he did not sign a coerced and fabricated confession. After approximately seven years in prison, Frazier's conviction was overturned because of Nordo's conduct.

56.    As a result of the pattern of police misconduct that was in effect at the time of the investigation of the homicide for which Mr. Oliver was charged, the United States District Court for the Eastern District of Pennsylvania entered a consent decree in the matter of NAACP v. City of Philadelphia requiring wide-ranging reforms in the Philadelphia Police Department and, in particular, providing for specific limitations on the investigative practices and policies of the Philadelphia Police Department.

57.    During the 1980's and 1990's, and concurrent with the time of the investigation of this case by the Philadelphia Police Department, there was within the Department a pattern, practice and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments.  On three separate occasions in the 1980's, the United States District Court of Eastern District of Pennsylvania issued orders enjoining the Philadelphia Police Department from engaging in these practices:

a.  *Cliett v. City of Philadelphia* (1985): consent decree arising out of "Operation Cold Turkey," which resulted in the unlawful arrest and detention of 1500 individuals in drug sweeps.;

b.  *Spring Garden Neighbors v. City of Philadelphia* (1985): enjoining police sweeps of Latinos in the Spring Garden neighborhood as a part of a Homicide Unit investigation.; and

c.  *Arrington v. City of Philadelphia* (1988): enjoining unconstitutional stops, detentions and searches of Black men during the "Center City Stalker" investigation.

57.     At the time of the investigation and prosecution of Mr. Oliver, the Philadelphia

Police Department had a practice, policy, and/or custom of:

     a.  engaging in unlawful interrogations of witnesses, witness detentions and
        interrogations, planting of evidence, fabrication of witness and suspect statements,
        coercing false identifications through the use of unconstitutional identification
        procedures, coercing false confessions through the use of unconstitutional conduct
        and procedures, and failing to disclose exculpatory statements and evidence;

     b.  failing to take appropriate disciplinary or other corrective actions with respect to
        police officers who engaged in illegal or unconstitutional conduct;

     c.  failing to properly train and supervise officers with respect to the constitutional
        limitations on their investigative, detention, search, and arrest powers;

     d.  ignoring, with deliberate indifference, systemic patterns of police misconduct and
        abuse of civilians' rights in the course of police interrogations, searches and
        arrests, coercion of witnesses and suspects, falsifying and fabricating evidence,
        coercion of false identifications through the use of constitutionally defective
        identification procedures coercion of false confessions through the use of
        unconstitutional conduct and procedures, and suppression of exculpatory
        evidence;

     e.  failing to properly sanction or discipline Philadelphia Police Department officers,
        who are aware of and conceal or aid and abet violations of constitutional rights of
        individuals by other Philadelphia Police Department officers, thereby causing and
        encouraging Philadelphia Police, including the individual Defendants in this case,
        to violate the rights of citizens such as Mr. Oliver.

58.     At the time of the investigation and prosecution of Mr. Oliver, and for many years

before and thereafter, the Philadelphia Police Department and the City of Philadelphia has been

deliberately indifferent to the need to train, supervise, and discipline police officers.  The Internal

Affairs Division of the Philadelphia Police Department has failed to provide an internal

disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the

following respects:

     a.  the Philadelphia Police Department's internal investigatory process was riddled
        with excessive and chronic delays in resolving disciplinary complaints;

b. the Philadelphia Police Department lacked consistent, rational, and meaningful disciplinary and remedial actions;

c. the Philadelphia Police Department failed to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d. the Philadelphia Police Department's internal investigatory process fell below the accepted standards and practices and was arbitrary and inconsistent;

e. the Philadelphia Police Department discipline, as practiced, was incident-based rather than progressive; thus, repeat violators were not penalized in proportion to their number of violations;

f. the conduct of Internal Affairs investigations demonstrated that the Philadelphia Police Department internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

g. a global analysis of Internal Affairs' investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

h. the Philadelphia Police Department lacked an effective early warning system to identify, track, and monitor "problem" officers;

i. Internal Affairs failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct, and interviews that were conducted were below acceptable standards of police practices and failed to address key issues.


## **DAMAGES**

59.     The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants and the City of Philadelphia caused Mr. Oliver to be improperly arrested and subjected to the horrors of imprisonment, unfairly tried, wrongfully convicted and forced to serve over eight years in prison for a crime he did not commit.

60.     As a direct result of Defendants' conduct and omissions, Mr. Oliver sustained injuries and damages, including loss of freedom for more than fourteen years, loss of his relationships with family members, pain and suffering, mental anguish, emotional distress,

countless indignities, degradation, permanent loss of natural psychological development, loss of life's pleasures, and restrictions on all forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, voting, travel, enjoyment, and freedom of speech and expression.

61.     As a direct result of Defendants' conduct and omissions, Mr. Oliver sustained economic injuries and damages, including loss of income from the employment he maintained before his wrongful arrest and incarceration and the loss of career opportunities.

62.     As a direct result of Defendants' conduct and omissions, Mr. Oliver sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

## COUNT I
### 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments
### (Against all Individual Defendants)

63.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

64.     The individual Defendants, acting with malice individually and in concert, and knowing that probable cause did not exist to prosecute Mr. Oliver for Jakeim Bates's murder, intentionally caused Mr. Oliver to be arrested, charged, and prosecuted for that and other crimes, thereby violating Mr. Oliver's clearly established right, under the Fourth and Fourteenth Amendments of the U.S. Constitution, to be free of prosecution absent probable cause.

65.     The individual Defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in an arrest and prosecution without probable cause.

66.     The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Oliver's clearly established constitutional rights.  No reasonable officer in1998 would have believed this conduct was lawful.

67.     The prosecution finally terminated in Mr. Oliver's favor on June 13, 2024, when the DAO requested that the court *nolle pros* the case.

68.     The acts and omissions by the individual Defendants described in the preceding paragraphs were the direct and proximate cause of Mr. Oliver's injuries as these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Mr. Oliver.


### COUNT II
**42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation (Against All Individual Defendants)**

69.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

70.     The individual Defendants, acting individually and in concert, and within the course and scope of their employment with the Philadelphia Police Department deprived Mr. Oliver of his clearly established constitutional right to due process of law and to a fair trial by fabricating inculpatory evidence and deliberately using coercion and/or suggestion to obtain

inculpatory witness statements, including without limitation: the false statements of witnesses; Mr. Wallace fabricated confession; and misleading presentation of phone calls.

71.    The individual Defendants deprived Mr. Oliver of his right to a fair trial by withholding material exculpatory and impeachment evidence.

72.    The individual Defendants deprived Mr. Oliver of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including without limitation by failing to obtain complete witness statements and conduct a complete investigation.

73.    The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Oliver's clearly established constitutional rights.  No reasonable officer in 1998 would have believed this conduct was lawful.

74.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Oliver's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Oliver's wrongful arrest, prosecution, conviction, and incarceration.


## COUNT III
### 42 U.S.C. § 1983 Civil Rights Conspiracy
### (Against All Individual Defendants)

75.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

76.    The individual Defendants, acting within the course and scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Oliver of his clearly established Fourth, Fifth, and

Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, self-incrimination, and his right to a fair trial.

77.    In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

     a.  Suggesting, coercing, and/or fabricating inculpatory evidence in the form of witness statements;

     b.  Coercing and fabricating false statements from Marcus Best and Khlif Goldwire;

     c.  Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* and impeachment material during the pendency of the case;

     d.  Wrongfully prosecuting Mr. Oliver while knowing that they lacked probable cause; and

     e.  Committing perjury during hearings and trials.

78.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Oliver's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Oliver's wrongful arrest, prosecution, conviction, and incarceration.

### COUNT IV
### 42 U.S.C. § 1983 Failure to Intervene
### Against All Individual Defendants

79.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

80.    By their conduct and under color of state law, the individual Defendants, acting within the course and scope of their employment with the Philadelphia Police Department, had

opportunities to intervene on behalf of Mr. Oliver to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

81.     These Defendants' failures to intervene violated Mr. Oliver's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.  No reasonable police officer in 1998 would have believed that failing to intervene to prevent these Defendants from coercing and fabricating inculpatory evidence, using coercion and/or direct suggestion to obtain false witness statements, withholding material exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Oliver to be arrested and prosecuted without probable cause, were lawful acts.

82.     Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Oliver's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Oliver's wrongful arrest, prosecution, conviction, and incarceration.


**COUNT V**
**42 U.S.C. § 1983 Municipal Liability Claim**
**(Against Defendant City of Philadelphia)**

83.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

84.     The City of Philadelphia, by and through its final policymakers, had in force and effect during the time of Mr. Oliver's wrongful arrest and conviction, and for many years preceding and following this investigation a policy, practice, or custom of unconstitutional

misconduct in homicide and other criminal investigations, including in particular the use of

coercive techniques in interviews and interrogations to obtain confessions; the fabrication of

inculpatory evidence; the fabrication of incriminating statements from witnesses, suspects, and

arrestees by coercion, suggestion, and feeding details about the crime; and the withholding of

exculpatory evidence.

85.    Final policymakers for the City of Philadelphia had actual or constructive notice

of these practices, policies, and customs, but repeatedly failed to make any meaningful

investigation into charges that homicide detectives were using coercive techniques in interviews

and interrogations to obtain confessions; withholding exculpatory evidence; fabricating

inculpatory evidence; and, particularly, fabricating incriminating statements from witnesses,

suspects, and arrestees by coercion, suggestion, and feeding details about the crime, and failed to

take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

86.    Mr. Oliver's injuries and damages were further proximately caused by policies

and practices on the part of policymakers with responsibility of administration of the District

Attorney's office to allow the withholding of exculpatory and/or inconsistent evidence, allow

witness to provide false testimony, and to pursue profoundly flawed investigations and

prosecutions.

87.    The widespread practices described in the preceding paragraphs, of which the

City of Philadelphia had actual or constructive notice, were allowed to flourish because the

Police Department and District Attorney's office declined to implement sufficient training and/or

any legitimate mechanisms for oversight or punishment.

88.     Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Mr. Oliver's wrongful arrest, prosecution, and twenty-four years of incarceration, as well as all the other injuries and damages set forth above.


## COUNT VI
### Malicious Prosecution Under Pennsylvania State Law
### (Against All Individual Defendants)

89.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

90.     The individual Defendants initiated or continued proceedings against Mr. Oliver, without probable cause, with malice or specific intent to injure, and the proceedings ultimately terminated in Mr. Oliver's favor on June 13, 2024, when the DAO asked the court to *nolle pros* all charges.

91.     As a result of this malicious prosecution, Mr. Oliver sustained the injuries and damages set forth above.


## PUNITIVE DAMAGES

92.     The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

93.     The conduct of the individual Defendants was outrageous, malicious, wanton, willful, reckless, and intentionally designed to inflict harm upon Plaintiff.

94.     As a result of the acts of the Defendants alleged in the preceding paragraphs, Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiff requests the following relief:

a.   That the Court award compensatory damages to Plaintiff and against all

Defendants, jointly and severally, in an amount to be determined at trial;

b.   That the Court award punitive damages to Plaintiff, and against all individual

Defendants in their individual capacity, in an amount to be determined at trial,

that will deter such conduct by Defendants in the future;

c.   A declaratory judgment that the practices and policies complained of are

unconstitutional;

d.   For pre-judgment and post-judgment interest and recovery of Plaintiff's costs,

including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42

U.S.C. § 1983 claims; and

e.   For such other and further relief as appears reasonable and just.

MARRONE LAW FIRM, LLC

By:___s/ Michael D. Pomerantz_____

Michael D. Pomerantz, Esquire
Attorney for Plaintiff
200 South Broad Street, Suite 610
Philadelphia, PA  19102
(215) 732-6700
mpomerantz@marronelaw.com
PA Atty ID# 83415

Date: January 13, 2025