## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MONTRELL OLIVER,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| | |
| **v.** | |
| | |
| **CITY OF PHILADELPHIA,** | **NO.  25-197** |
| **DETECTIVE TIM BASS,** | |
| **DETECTIVE WILLIAM GROSS,** | |
| **DETECTIVE RICHARD HARRIS, AND** | |
| **DETECTIVE RICHARD BOVA, in their** | |
| **individual capacities,** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Montrell Oliver brings this civil rights action against Detectives Tim Bass, William Gross, Richard Harris, and Richard Bova ("the Individual Defendants") of the Philadelphia Police Department ("PPD"), all in their individual capacities, asserting claims under Pennsylvania law and under 42 U.S.C. § 1983 for malicious prosecution, denial of due process, conspiracy, and failure to intervene.  He also brings, against the City of Philadelphia ("the City"), a municipal liability claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

The City and the Individual Defendants each separately move to dismiss the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons that follow, the Motions will be granted in part and denied in part.

### I.    FACTUAL BACKGROUND

The following facts are taken from Oliver's Amended Complaint, well-pleaded allegations from which are considered true at this stage.  *See Fowler v. UPMC Shadyside*, 578

1

F.3d 203, 210-11 (3d Cir. 2009) (citation omitted).

On February 16, 1997, Juakeim Bates and two companions—Johann Weldon and Larry Smith—drove from Norristown to Philadelphia to buy drugs. Omar Goldwire, who knew Bates, joined them and directed the group to his neighborhood in Mantua, where he told them they could get what they wanted. Bates and Omar Goldwire knocked on a few doors in the neighborhood but were unsuccessful in finding any drugs. As Bates was walking back to the car from one of these homes, an unknown man with a shotgun approached, demanded money, and opened fire on Bates and his companions. Omar Goldwire, who had been seen speaking with an unknown man just before the ambush, also started shooting. Bates suffered a fatal chest wound and was pronounced dead later that night.

About forty-five minutes after the shooting, police located Omar Goldwire at a Girard Avenue gas station and arrested him on an unrelated warrant. He was in the company of his brother, Khalif Goldwire, and Khalif's friend, Marcus Best, both of whom were permitted to leave the scene. Detectives interviewed Khalif Goldwire and Best roughly seventeen hours later. Both of them implicated Plaintiff Montrell Oliver and another man—identified by Best only as "Jimmy"—in the homicide. Oliver was subsequently arrested and charged in connection with the crime.

At Oliver's preliminary hearing, Khalif Goldwire disavowed his police statement and thereafter refused to testify at trial. Best, however, hewed to his story. At Oliver and Omar Goldwire's joint criminal trial, Best testified that Oliver had been present at the Goldwire residence when the shooting occurred. Oliver alleges that detectives and prosecutors knew all along that Best's accusation was false because it relied on the involvement of "Jimmy" Whitney, who was incarcerated at the time of the murder. No charges were ever brought against Whitney

or any other person for involvement in the crime.

Oliver maintained his innocence throughout the criminal proceedings.  He did not testify during the guilt phase of the trial, but his attorney argued that he did not match eyewitness descriptions of the assailants; that he had not been at the crime scene; and, that the only evidence against him—the testimony of Marcus Best—was unreliable.  Despite this, the jury convicted Oliver of all charges on February 17, 1998.  During the penalty phase he testified that he spent the night with June Bell at an apartment on Spring Garden Street.  Bell, Duane Napper (the apartment's occupant), Jadean Whitmore, and eyewitness Shallom Roberts later supplied statements corroborating Oliver's alibi, but none of them testified at trial.  Bell later averred in a sworn affidavit that a "white guy" threatened her with life imprisonment if she did not "tell him who did" the murder; however, she maintained that she was willing to testify in Oliver's favor but was never asked to do so.

Oliver remained incarcerated for more than twenty-four years, followed by two years on parole.  In 2010, Khalif Goldwire submitted an affidavit formally retracting his 1997 statement and declaring that Oliver was not present at the Goldwire house on the night of the crime.  In 2024, after investigation by its Conviction Integrity Unit, the Philadelphia District Attorney's Office asked a Philadelphia County court to vacate Oliver's conviction, which it did.  All charges against Oliver were subsequently marked *nolle prosequi*.

## II.    LEGAL STANDARDS

To survive a motion to dismiss brought pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. When analyzing a motion to dismiss, the complaint must be construed "in the light most favorable to the plaintiff," with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler*, 578 F.3d at 210 (citation omitted). Legal conclusions are disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those facts state a "plausible claim for relief." *Id*. at 210-11 (citation omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III.    DISCUSSION

Oliver's federal claims arise under 42 U.S.C. § 1983, which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983. To maintain an action under § 1983, Oliver must plausibly allege a violation of a right secured by the Constitution or laws of the United States that was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

In his Amended Complaint, Oliver alleges that the Individual Defendants violated his constitutional rights in six different ways, and that the City is liable for those violations under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). All Defendants argue that Oliver has failed to state a claim for each of these theories of recovery, and the Individual Defendants

further argue that they are entitled to qualified immunity on four of those theories.[1]  The Court has discretion to decide "which of the two prongs of the qualified immunity analysis"—(1) whether a right was violated, and (2) whether that right was clearly established at the time— "should be addressed first . . . ."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Below, Oliver's § 1983 claims will be analyzed first for failure to state a claim.  Whether the right implicated in each claim was clearly established will be addressed only where Oliver has sufficiently alleged that that right was violated.

### A.  Malicious Prosecution

Three of Oliver's claims are for malicious prosecution: two under the Fourth and Fourteenth Amendments, made actionable by 42 U.S.C. § 1983, and one under Pennsylvania law.  The Parties agree that Oliver's two federal malicious prosecution claims should be interpreted under the same framework—namely, the rubric of the Fourth Amendment—to wit, that " (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and, (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding."  *DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005).  Under Pennsylvania law, malicious prosecution requires "(1) the institution of proceedings against the plaintiff without probable cause and with malice" and (2) a showing that "the proceedings were terminated in favor of the plaintiff."  *York v. Kanan*, 298 A.3d 533, 542 (Pa. Commw. 2023).

---

[1] Specifically, they assert qualified immunity regarding Oliver's claims for malicious prosecution, evidence fabrication, conspiracy, and failure to intervene.  However, as set forth below, because Oliver does not state a claim for malicious prosecution, conspiracy, or failure to intervene, it need not be considered whether the Individual Defendants are entitled to qualified immunity on those claims.

The Individual Defendants argue, among other things, that the Amended Complaint lacks "non-conclusory allegations plausibly suggesting . . . that there was a lack of probable cause for the criminal proceedings" against Oliver.  With regard to the probable cause element, "[w]hether any particular set of facts suggest that an arrest is justified by probable cause requires an examination of the elements of the crime at issue."  *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005), *abrogated on other grounds by Rivera-Guadalupe v. City of Harrisburg*, 124 F.4th 295 (3d Cir. 2024); *see also Saintil v. Borough of Carteret*, 2024 WL 3565308, at *6 (3d Cir. July 29, 2024) (applying framework).

Here, Plaintiff's Amended Complaint suggests that Oliver was charged and convicted with the "murder" of Juakeim Bates, but it does not specify under which Pennsylvania statute he was charged and convicted.  Pennsylvania law, however, recognizes many types of murder, each with different elements.  *See Commonwealth v. Naranjo*, 53 A.3d 66, 71 n.3 (Pa. Super. 2012) (recounting those differences).  Furthermore, the Amended Complaint alleges that, at trial, Oliver was convicted of "all the charges" against him, but it does not specify what other crimes, besides some version of "murder," he was charged with committing.  Without knowing what actual charges were brought against Oliver, it is not possible to evaluate whether the Individual Defendants had probable cause to initiate a prosecution for each or any of those crimes, as a court is required to do in analyzing a malicious prosecution claim.  *See Johnson v. Knorr*, 477 F.3d 75, 85 (3d Cir. 2007).

Since the Amended Complaint does not specify which crimes Oliver was charged with and convicted of, it lacks "the facts necessary to permit the inference to be drawn that the criminal proceedings against him were commenced maliciously and/or without probable cause." *Hughes v. City of Philadelphia*, 2023 WL 4852294, at *3 (E.D. Pa. July 28, 2023); *cf. Lockhoff v.*

*Slonaker*, 2017 WL 2423790, at *13 (E.D. Pa. June 5, 2017) (explaining that "[w]ithout the benefit of an affidavit of probable cause," among other things, it would not be possible as a matter of law to determine whether the arresting officer "had probable cause to initiate criminal proceedings"). Accordingly, the malicious prosecution claims shall be dismissed without prejudice.

### B. Due Process

In Count II of the Amended Complaint, Oliver brings a § 1983 claim premised on three violations of his Fourteenth Amendment right to due process. Specifically, he alleges that the Individual Defendants: (1) fabricated inculpatory evidence; (2) suppressed exculpatory evidence; and, (3) deliberately failed to conduct a constitutionally adequate investigation into Bates's murder. Each theory is analyzed separately below.

### i. *Evidence Fabrication*

To state a claim for evidence fabrication in violation of the Fourteenth Amendment, Oliver must show: (1) that the Individual Defendants fabricated evidence that was used to initiate criminal charges against him, and (2) that "there is a reasonable likelihood that, absent that fabricated evidence, [he] would not have been criminally charged." *Black v. Montgomery Cty.*, 835 F.3d 358, 371 (3d Cir. 2016). To meet the first element, Oliver must plead facts plausibly suggesting that each Individual Defendant "formulated or submitted false evidence willfully, knowingly, or with a reckless disregard for its truth." *Mervilus v. Union Cty.*, 73 F.4th 185, 194-95 (3d Cir. 2023). Furthermore, the fabricated evidence must be "so significant that it could have affected the outcome of the criminal case." *Black*, 835 F.3d at 372. The second element "requires that [Oliver] draw a meaningful connection between [his] particular due process injury and the use of fabricated evidence against [him]." *Id.* (internal quotation omitted). This element

requires a showing of "both factual and proximate causation." *Halsey v. Pfeiffer*, 750 F.3d 273, 294 n.19 (3d Cir. 2014).

Here, Oliver alleges that the Individual Defendants fabricated two pieces of evidence: (1) the police statement of Khalif Goldwire, and (2) the police statement and trial testimony of Marcus Best. For the reasons explained below, Oliver states a claim with regard to the former, but not the latter.

a.   Statement of Khalif Goldwire

According to the Amended Complaint, Khalif Goldwire was interviewed by police less than a day after the shooting took place. In his statement, he "implicated" Oliver and another man (whose name he did not know) in Bates's murder. However, when called to testify at Oliver's preliminary hearing, he "disavowed" the statement he made to police; likewise, he did not testify at Oliver's trial. Oliver also alleges that, in an affidavit submitted in support of a *pro se* Post Conviction Relief Act petition filed by Omar Goldwire in 2010, Khalif Goldwire "stated that his 1997 police statement implicating [Oliver] was a lie and that Oliver was not at the Goldwire house on the night of Bates's murder." Finally, elsewhere in the Amended Complaint, Oliver alleges that "[Khalif] Goldwire long ago recanted and described how he was coerced by Detectives Gross and Bass into implicating [him]" in the murder.

As explained above, to state a claim for evidence fabrication in violation of the Fourteenth Amendment, Oliver must show (1) that the Individual Defendants fabricated evidence that was used to initiate criminal charges against him, and (2) that "there is a reasonable likelihood that, absent that fabricated evidence, [he] would not have been criminally charged." *Black*, 835 F.3d at 371. The Individual Defendants' sole argument here is premised only on the second element. Specifically, they contend that because Khalif Goldwire did not testify at

Oliver's trial his statement could not have "affected the outcome of the criminal proceedings." But, contrary to their representations in their briefing, there is no requirement that the fabricated evidence actually be introduced to a jury that returns a guilty verdict; in fact, the Third Circuit expressly rejected that argument in *Black v. Montgomery County*. *See* 835 F.3d at 371 ("We see no reason to require a conviction as a prerequisite to a stand-alone due process claim against a state actor for fabrication of evidence."). What matters is not whether fabricated evidence "affected the *outcome* of the criminal proceeding," but rather whether it was "both [a] factual and proximate caus[e]" of the initiation of the prosecution itself. *Halsey*, 750 F.3d at 294 n.19 (emphasis added).

Here, the Amended Complaint sufficiently alleges that, without Khalif Goldwire's statement, there is a "reasonable likelihood" that Oliver would not have been charged with Bates's murder. *Black*, 835 F.3d at 371. Oliver specifically pleads that his arrest was "[b]ased on the statements" given by Khalif Goldwire and Marcus Best to police in the hours after the crime. Elsewhere, in the context of his criminal trial, Oliver pleads that Best was the only witness who implicated him in the crime, and that no other witnesses identified him as one of the shooters. These pleadings, considered in the light most favorable to Oliver, *see Fowler*, 578 F.3d at 210, suggest that Khalif Goldwire's and Best's statements to police were the only pieces of evidence implicating Oliver in the crime at the time the decision was made to prosecute him. Each statement, then, was "both [a] factual and proximate caus[e]" of the prosecution against Oliver, *Halsey*, 750 F.3d at 294 n.19, so it is reasonably likely that, without one of these two statements, he would not have been arrested and charged. *Black*, 835 F.3d at 371. Since the Individual Defendants' lone argument concerning Khalif Goldwire's statement fails, Oliver states an evidence fabrication claim against them with respect to that statement.

b.  <u>Statement and Testimony of Marcus Best</u>

Like Khalif Goldwire, Marcus Best was also interviewed by police within a day the after the shooting.  In his police statement, he likewise implicated Oliver and another man in the crime; however, unlike Khalif Goldwire, Best was able to name the other man, identifying him as "Jimmy."  Later, at Oliver's trial, Best testified that Oliver was at the Goldwire house at the time of the murder.  Oliver alleges that the Individual Defendants "knew that Best's statements about [Oliver's] alleged participation in the homicide were false," and that, "[d]espite this knowledge," they "sought and obtained an arrest warrant for [Oliver] . . . based on evidence that was known to be false."  The Individual Defendants knew Best's information was false, according to the Amended Complaint, because the person called "Jimmy" that Best implicated was actually a man named Jimmy Whitney, who was incarcerated at the time of the crime and, thus, could not have participated in it.  That fact suggests that "Marcus Best testified falsely" at trial "and that the Commonwealth knew that Best's testimony was false."

With regard to Marcus Best's police statement and trial testimony, the Individual Defendants argue that Oliver "does not plausibly allege that the police fabricated the statement," but only asserts, without factual support, that the police knew that Best's statement was a lie. This argument implicates the first of the evidence fabrication elements, which requires Oliver to plausibly allege that the Individual Defendants fabricated evidence that was used to initiate criminal charges against him.  *Black*, 835 F.3d at 371.  Among other things, this element requires Oliver to plead facts suggesting that each Individual Defendant "formulated or submitted false evidence" to prosecutors "willfully, knowingly, or with a reckless disregard for its truth." *Mervilus*, 73 F.4th at 194-95.

Here, Oliver draws central attention to his allegation in the Amended Complaint that

"Best's statement and testimony ha[ve] always been known by police to be false." But where, as here, a defendant's knowledge (or lack thereof) is the precise legal question at issue, a conclusory allegation like this is not entitled to the presumption of veracity. *See Fowler*, 578 F.3d at 210-11 ("The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."). Instead, Oliver must "show" through other facts— and not simply declare—that he is entitled to relief. *Id*. (internal quotation omitted).

To this end, Oliver contends that additional facts in the Amended Complaint support the conclusion that the Individual Defendants "submitted Best's statement to prosecutors knowing that it was false, [or,] at a minimum, with a reckless disregard for its truth." Specifically, he points to the following allegations: (1) that Thelma Goldwire—mother of Oliver's codefendant, Omar Goldwire—testified at the penalty phase of the trial that her son had committed prior robberies with a man named Jimmy Whitney, who was incarcerated at the time of Bates's murder; (2) that Whitney's incarceration at that time is confirmed by a document from the Pennsylvania Department of Corrections showing as much; (3) that Omar Goldwire, Khalif Goldwire, Marcus Best, and Jimmy Whitney all hung out together as friends, while Oliver did not; and, (4) that the Goldwire brothers and Jimmy Whitney had previously committed a staged robbery together, the underlying facts of which were similar to the Bates murder.

Although these facts do suggest that Marcus Best's statement was indeed false, none of them say anything about the mental state of the Individual Defendants at the time Best's statement was taken and forwarded to prosecutors. By way of example only, the Amended Complaint does not allege that the Individual Defendants took Best's reference to "Jimmy" to refer to Jimmy Whitney; that they knew that Whitney was incarcerated at the time of the Bates murder; that they knew that the Goldwires, Best, and Whitney were friends; or, that they were

11

aware of the existence and circumstances of Best's previous crimes.  Without any factual allegations suggesting that the Individual Defendants knew or should have known that Best's story was false, Oliver has not plausibly pleaded that the Individual Defendants "fabricated" Best's statement or trial testimony.  *Black*, 835 F.3d at 371; *Mervilus*, 73 F.4th at 194-95. Accordingly, the Amended Complaint does not state a claim for evidence fabrication with regard to Best's statement and testimony.

### c.  Qualified Immunity on Evidence Fabrication Claim

The Individual Defendants argue that they are entitled to qualified immunity on Oliver's evidence fabrication claims.  However, since Oliver's only surviving evidence fabrication claim concerns Khalif Goldwire's police statement, the qualified immunity analysis will be conducted for that claim alone.  *See Pearson*, 555 U.S. at 236.

"Qualified immunity protects government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Halsey*, 750 F.3d at 287 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A constitutional right is clearly established when it is "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  This means that "there is either 'closely analogous' caselaw establishing that a defendant's conduct was unlawful or 'evidence that the [d]efendant's conduct was so patently violative of the . . . right that reasonable officials would know [it to be a violation] without guidance from a court.'"  *Mack v. Yost*, 63 F.4th 211, 231-32 (3d Cir. 2023) (quoting *Schneyder v. Smith*, 653 F.3d 313, 330 (3d Cir. 2011)).

The Individual Defendants argue that the constitutional violation alleged here—coercing

a witness into accusing someone of a murder, then using that accusation to initiate a prosecution against the accused—was not clearly established in 1998 when the alleged fabrication took place. But this position is squarely foreclosed by Third Circuit precedent.  For example, in *Halsey v. Pfeiffer*, the Court of Appeals held that defendant police officers who fabricated a confession in 1985 "should have [been] informed"—both by decades of "[a]nalogous precedent" from the Supreme Court and by "[t]he obviousness of th[e] violation" itself— that "fabricating evidence for use in a criminal prosecution" would "violate a defendant's constitutional rights." 750 F.3d at 295-96.  *See also Dennis v. City of Philadelphia*, 19 F.4th 279, 290 (3d Cir. 2021) (concluding that, as of 1992, "framing criminal defendants through use of fabricated evidence . . . violated clearly established law").

The Individual Defendants recognize these precedential cases but argue that, because *Halsey* and *Dennis* involve nonidentical fact patterns when compared with the case at bar, they do not control the outcome of the qualified immunity analysis here.  But "[t]he Supreme Court does not require that earlier cases share the same or even similar facts for a right to be deemed clearly established; it is enough that the prior cases are 'factually analogous.'"  *Clark v. Coupe*, 55 F.4th 167, 182 (3d Cir. 2022) (quoting *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021)).  *Halsey* and *Dennis* are exactly that; they involved the use of false, fabricated evidence to prosecute an innocent defendant, which is precisely what Oliver alleges in his Amended Complaint.  *See Halsey*, 750 F.3d at 284-85 (defendant police officers fabricated a written murder confession); *Dennis*, 19 F.4th at 284 (defendant police officers "coerced and threatened [a witness] to testify falsely at trial that he saw Dennis with a gun the night of the murder").  For these reasons, the Individual Defendants have failed to demonstrate that "a reasonable official would [not] understand that" coercing Khalif Goldwire into implicating Oliver in Bates's murder

would violate his clearly established right to due process. *Anderson*, 483 U.S. at 640.

Accordingly, their bid to invoke the defense of qualified immunity fails with respect to Oliver's

evidence fabrication claim based on Khalif Goldwire's police statement.

### ii.    Suppressing Exculpatory Evidence

In the second of his three Fourteenth Amendment due process claims, Oliver alleges that

the Individual Defendants "deprived [him] of his right to a fair trial by withholding material

exculpatory and impeachment evidence" in violation of his due process rights under the

Fourteenth Amendment.  Although Oliver mentions "exculpatory and impeachment evidence,"

the Amended Complaint nowhere specifies what impeachment evidence the Individual

Defendants allegedly withheld from him.  Accordingly, he fails to state a claim under § 1983 to

the extent it is premised on the theory that the Individual Defendants did not turn over

impeachment evidence. *Iqbal*, 556 U.S. at 678 (explaining that, to survive a Motion to Dismiss,

"a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that

is plausible on its face" (internal quotations omitted)).

With respect to his claims concerning exculpatory evidence, Oliver alleges that the

Individual Defendants "threatened" a potential alibi witness, June Bell, "so that she would not

come forward to confirm [his] innocence."  According to Oliver, he was with Bell at the time of

the murder and spent the night with her; Bell would have testified to this, but she was allegedly

threatened "with prosecution and a life sentence if she did not do what" the Individual

Defendants "wanted her to do"—which, ostensibly, was to either implicate Oliver in the crime or

else stay silent.

It is well-settled, under *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and its progeny, that

the police officers can violate a defendant's due process rights by "affirmatively conceal[ing]

material [exculpatory] evidence from the prosecutor." *Gibson v. Superintendent*, 411 F.3d 427, 443 (3d Cir. 2005), *overruled on other grounds by Dique v. N.J. State Police*, 603 F.3d 181, 183 (3d Cir. 2010); *see also Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (per curiam). But Oliver does not seem to be bringing a *Brady* claim here—despite fashioning his claim as one seeking relief for the "withholding" of exculpatory evidence.[2]  Instead, Oliver seems to seek redress for the *deliberate suppression* of exculpatory evidence—namely, June Bell's alibi testimony—allegedly worked by the threats and intimidation of the Individual Defendants.  To state a claim under that theory, Oliver must plead facts suggesting that his "imprisonment result[ed] from . . . concealing evidence to create false testimony to secure a conviction" against him.  *Dennis*, 19 F.4th at 291.

On this front, the Individual Defendants argue that the Amended Complaint actually suggests the opposite conclusion—that June Bell was willing and able to testify on Oliver's behalf but was not asked to due to the incompetence of Oliver's trial counsel.  Their argument is based on an affidavit from Bell, prepared and sworn in 2018, and attached as an exhibit to the Amended Complaint.  Bell's affidavit reads, in relevant part, as follows:

> After [the murder] I was in a group home called Boys Town.  A white guy came there and questioned me about the murder.  He said they were all my friends and I knew who did it.  He said if I didn't tell him who did it I would go to jail for the rest of my life for the murder.  I told him I wasn't there and I had no idea who did the murder.  I also told him that I knew for sure [Oliver] did not commit the murder because he was with me at my place the whole night of the murder.  The man became angry and left.

> I don't know why I was not asked to testify at [Oliver's] trial.  I have been willing to testify for [Oliver] since this incident happened.

---

[2] If he did, it would likely fail, because *Brady* does not extend to "information which [a defendant] already has or, with any reasonable diligence, he can obtain himself."  *United States v. Pelullo*, 399 F.3d 197, 213 (3d Cir. 2005) (internal quotation omitted).  Since Oliver knew he was with June Bell on the night of the murder, it cannot be reasonably said that the Individual Defendants had a duty, under *Brady*, to disclose that fact to prosecutors as part of the investigation.

The Individual Defendants draw attention to the closing two sentences of this statement, where Bell expresses that she "ha[s] been willing to testify for Oliver since this incident happened" and states that she does not "know why [she] was not asked to testify" in his defense.  Oliver, for his part, argues that Bell's willingness to testify "does not erase the direct threats and intimidation" used by the Individual Defendants "in trying to coerce [her] not to testify."

The Individual Defendants have the better of the argument here.  To succeed on an evidence suppression claim, Oliver plead facts suggesting that his "imprisonment result[ed] from . . . concealing evidence to create false testimony to secure a conviction" against him. *Dennis*, 19 F.4th at 291.  As an initial matter, Bell does not state that the "white guy" who threatened her was as one of the Individual Defendants.  But even reading Bell's statement in the light most favorable to Oliver—*i.e.*, to mean that Bell was indeed threatened by one of the Individual Defendants—her statement undermines Oliver's claims because it explicitly states that she was willing to testify on Oliver's behalf despite the threats against her.  Therefore, although "imprisonment result[ed]" after a trial where Bell's testimony was not offered, the Amended Complaint does not establish that Oliver's conviction was secured as a result of that testimony being "conceal[ed]" through intimidation, since Bell explicitly states that this was not the case.  And since Oliver pleads no other facts plausibly suggesting that Bell's testimony was silenced by the Individual Defendants' malfeasance, he has failed to state a claim for deliberate evidence suppression.  *See Dennis*, 19 F.4th at 291.

### iii.    *Deliberately Failing to Conduct a Constitutionally Adequate Investigation*

In the last of his three Fourteenth Amendment due process claims, Oliver alleges that the Individual Defendants violated § 1983 by "deliberately failing to conduct a constitutionally

adequate investigation."  The Individual Defendants argue that this claim must be dismissed as a

matter of law because "[t]here is no constitutional right to a police investigation."  *Whitehead v.*

*City of Philadelphia*, 2014 WL 657486, at *2 (E.D. Pa. Feb. 19, 2014) (quoting *Town of Castle*

*Rock, Colo. v. Gonzales*, 545 U.S. 748, 768 (2005)).  Oliver contends that the Individual

Defendants "fail[ed] in their duty to find the truth in connection with an investigation that was

ongoing," and that a court in this District, in *Ogrod v. City of Philadelphia*, 598 F. Supp.3d 253,

268 (E.D. Pa. 2022), has previously recognized such behavior to ground a Fourteenth

Amendment due process claim.  But even if precedential—which it is not— *Ogrod*  stands for

exactly the opposite proposition.  *Id.* (agreeing with several "courts in this Circuit" which "have

stated without qualification that there is no constitutional right to a police investigation," and

collecting cases to that effect (cleaned up)).

Since Oliver has not demonstrated that the Fourteenth Amendment affords relief for the

Individual Defendants alleged deliberate failure to conduct a constitutionally adequate

investigation, that claim will be dismissed without prejudice.

### C.  Conspiracy

In Count III of the Amended Complaint, Oliver alleges that the Individual Defendants

engaged in a civil conspiracy to deprive him of his constitutional rights.  To state a claim for a

conspiracy under § 1983, "a plaintiff must establish (1) the existence of a conspiracy involving

state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the

conspiracy."  *Rosembert v. Borough of E. Lansdowne*, 14 F. Supp.3d 631, 647 (E.D. Pa. 2014)

(citing *Gale v. Storti*, 608 F. Supp.2d 629, 635 (E.D. Pa. 2009)).  Crucially, to plead that a

conspiracy existed, a plaintiff must establish that there was an agreement (or "meeting of the

minds") to violate their constitutional rights.  *Id*. (citing *Startzell v. City of Philadelphia*, 533

F.3d 183, 205 (3d Cir. 2008)).  This requires a plaintiff to plead facts suggesting "how, why, or when the alleged conspiracy came into existence."  *Gainey v. City of Philadelphia*, 704 F. Supp.3d 589, 603 (E.D. Pa. 2023).

Oliver's conspiracy claim fails because his allegations do not go beyond a "formulaic recitation of the elements" of a civil rights conspiracy claim.  *Twombly*, 550 U.S. at 555. Specifically, Oliver fails to allege facts suggesting that any of the Individual Defendants agreed with one another to deprive Oliver of his constitutional rights.  Oliver argues, in his briefing, that because he alleges that Defendants "Gross and Bass" worked together to "coerce[] Khalif [Goldwire] into implicating" him in the murder, and because Defendants "Harris and Bova" both "participated in the coercion of June Bell," at least two agreements to violate his rights can be deduced from the Amended Complaint.  But even viewed in the light most favorable to Oliver, these allegations do not suggest any prior agreement to violate Oliver's rights, because they say nothing about "how, why, or when the alleged conspiracy came into existence."  *Gainey*, 704 F. Supp.3d at 603 (dismissing civil rights conspiracy claim for failure to allege an agreement).

Oliver cites no caselaw to support the notion that a conspiratorial agreement is pleaded merely by alleging that two individuals worked together to violate a right, and caselaw from the Supreme Court and Third Circuit suggests otherwise.  *See, e.g., Twombly*, 550 U.S. at 556-57 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."); *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 295 (3d Cir. 2018) (rejecting argument that a plaintiff "sufficiently established an agreement among" defendant police officers, "before the fact, to use excessive force" against him because that claim was "not supported by any specific facts" suggesting a "common plan" among the officers). Accordingly, he has not sufficiently

pleaded any agreement, and his § 1983 conspiracy claim will be dismissed without prejudice.

### D. Failure to Intervene

Oliver requests that his failure to intervene claim, brought in Count IV of his Amended Complaint, be dismissed without prejudice, so it will be.

### E. Municipal Liability

Finally, in Count V of the Amended Complaint, Oliver alleges that the City of Philadelphia is liable for the constitutional violations he alleges he suffered pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Municipalities, like the City, cannot be held vicariously liable under § 1983 for constitutional violations committed by their employees. *See Monell*, 436 U.S. at 691, 694; *McGovern v. City of Philadelphia*, 554 F.3d 114, 121 (3d Cir. 2009). Instead, municipal liability under § 1983 must be predicated on injuries allegedly caused by either: (1) actions taken by a municipal official pursuant to policies or customs of the municipal entity; or, (2) "a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.'" *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (citing *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)).

Here, Oliver alleges that the City is liable under both the 'policy or custom' and 'failure or inadequacy' theories. Each theory will be analyzed separately.

### i. Policy or Custom

"Plaintiffs that proceed under a municipal policy or custom theory must make showings that are not required of those who proceed under a failure or inadequacy theory, and vice versa. Notably, an unconstitutional municipal policy or custom is necessary for the former theory, but not for the latter, failure or inadequacy theory." *Forrest*, 903 F.3d at 105. "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the

action' issues an official proclamation, policy, or edict." *Berg v. Cnty. of Allegheny*, 219 F.3d

261, 275 (3d Cir. 2000) (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996)).

Customs, alternatively, can be shown where the "practices of state officials . . . [are] so

permanent and well settled as to virtually constitute law." *Id*. (internal quotation omitted).  In

either case, the plaintiff must present evidence that an official with "final policy making

authority" either "authorized or acquiesced" in the policy or custom. *Oaks v. City of

Philadelphia*, 59 F. App'x 502, 504 (3d Cir. 2003).

     *Monell* imposes "rigorous standards of culpability and causation" for municipal liability,

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997), so "[a]lthough a

policy or custom is necessary to plead a municipal claim it is not sufficient to survive a motion to

dismiss" on its own. *Estate of Roman*, 914 F.3d at 798.  Instead, the policy or custom at issue

must also be shown to be the "proximate cause" of the plaintiff's alleged injuries. *See Kneipp*,

95 F.3d at 1213.  This requires showing an "affirmative link" between the policy or custom and

the particular constitutional violation, *see Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)

(quotations omitted), or that the municipality's conduct was the "'moving force'" behind the

plaintiff's alleged injuries, *Berg*, 219 F.3d at 276 (quoting *Bryan Cnty.*, 520 U.S. at 404).

Allegations that "simply paraphrase[]" the standard for municipal liability are too vague and

generalized to support a *Monell* claim.  *McTernan v. City of York*, 564 F.3d 636, 659 (3d Cir.

2009).

     Here, though Oliver alleges that the City had a "policy, pattern, or practice" of violating

criminal defendants' constitutional rights in a variety of ways, he nowhere identifies any

"proclamation, policy, or edict" as the proximate cause of his injuries. *Berg*, 219 F.3d at 275.

Instead, his claims seem to be based on alleged customs of the PPD.  And since the only

20

constitutional violation for which the Amended Complaint states a claim is the evidence fabrication claim involving the police statement of Khalif Goldwire, to state a claim for *Monell* liability under the custom theory Oliver must plead facts suggesting that the City had a custom that was the moving force behind the fabrication of that evidence.

To that end, Oliver alleges that, at the time of the Bates murder, the PPD had a custom of "using coercive techniques in interviews to obtain false and misleading statements from witnesses." To prove that this custom was "so permanent and well settled as to virtually constitute law," *id.* at 275, Oliver alleges the existence of numerous cases that precede his investigation in 1997 and in which PPD officers were determined to have coerced false statements from witnesses, including:

- *Commonwealth v. Raymond Carter*, which was investigated in 1986 and wherein "[a] Philadelphia judge ordered a new trial because the prosecution's star witness had been paid $500 by [a PPD officer] to testify against Carter." *See Carter v. City of Philadelphia*, 181 F.3d 339, 342 n.3 (3d Cir. 1999) (describing the misconduct).

- *Commonwealth v. Donald Ray Adams*, which was investigated between 1990 and 1992 and which involved the PPD "pressur[ing] and coerc[ing] an eyewitness" to implicate the defendant.

- *Commonwealth v. Jimmy Dennis*, which was investigated between 1991 and 1992 and which involved "[PPD] Homicide detectives coerc[ing] witnesses, fabricat[ing] evidence," and "employ[ing] unlawful investigat[ive] techniques[.]" *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 269 (3d Cir. 2016) (upholding District Court's grant of habeas corpus); *Dennis v. City of Philadelphia*, 19 F.4th at 292 (concluding that Dennis had stated a § 1983 claim for evidence fabrication).

- *Commonwealth v. Percy St. George*, which was investigated between 1993 and 1994 and in which a PPD "Homicide Detective coerced [a] person" to "sign a fabricated statement and to falsely identify" the defendant.

- *Commonwealth v. Messrs. Gilyard & Wells*, "which was investigated in August 1995" and "involved the fabrication and coercion of witness statements" and the "garnering of false identifications" by the PPD. *See Gilyard v. Dusak*, 2017 WL 2813225, at *9-16 (E.D. Pa. June 29, 2017) ("There are genuine issues of material fact whether the Detectives fabricated Mr. Harris's and coerced Mr. Williams's 1997 identifications . . . .").

The City, for its part, does not argue that these prior cases are insufficient, as a matter of law, to establish a custom of fabricating evidence through coercion for the sake of *Monell* liability.  Nor do they argue that Oliver has failed to show, if such a policy did exist, that it proximately caused his injuries.  Instead, the City argues that the presence of several other alleged customs in the Amended Complaint—customs that, as the City rightly notes, do not correspond to the facts of this case—render the Amended Complaint, as a whole, "overbroad and insufficiently focused, such that the City cannot possibly be on notice of, and defend itself against, the theories of municipal liability" alleged by Oliver.  But the City cites no caselaw suggesting that a complaint that states a claim for *Monell* liability under one theory must be dismissed *in toto* simply because it contains allegations suggesting that the plaintiff is proceeding on his *Monell* claim under different theories.  Accordingly, this argument is waived, and Oliver's *Monell* claim may proceed under the municipal custom theory.  *See* E.D. Pa. R. Civ. P. 7.1(c) ("Every motion not certified as uncontested, or not governed by Local Civil Rule 26.1(g), shall be accompanied by a brief containing a concise statement of the legal contentions and *authorities* relied upon in support of the motion.") (emphasis added); *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion . . . will be deemed waived." (citation omitted)).

### *ii.    Failure or Inadequacy*

Oliver also argues that the City is liable for the conduct of the Individual Defendants under a failure or inadequacy theory.  Failure or inadequacy claims impose on plaintiffs the "demanding requirement of demonstrating" that the proffered shortcoming "amount[s] to deliberate indifference on the part of the municipality."  *Forrest*, 930 F.3d at 106 (citation omitted).  To state a claim under this theory, a plaintiff must allege that: (1) municipal

policymakers knew that its employees would confront a particular situation; (2) the situation involved a difficult choice or a history of employees mishandling the situation; and, (3) the wrong choice by an employee would frequently cause deprivation of constitutional rights.  *Id.* (citing *Carter*, 181 F.3d at 357).  Although this theory of liability "arose in the failure-to-train context," it nonetheless "applies to other failures and inadequacies by municipalities, including those related to supervision and discipline of its police officers."  *Id.* at 105 (citation omitted).

Here, the Amended Complaint alleges that the City "has been deliberately indifferent to the need to train, supervise, and discipline police officers" by "failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct" and by "failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search, and arrest powers[.]"  The City argues that these allegations are conclusory, and do not state a claim for under the failure or inadequacy theory because they do not "specifically demonstrate" how the training, supervision, and disciplinary programs that the PPD had at the time "were inadequate" to protect against due process violations like the one Oliver alleges here.  *Torres v. City of Allentown*, 2008 WL 2600314, at *5 (E.D. Pa. June 30, 2008).  Since Oliver does not respond in any way to the City's arguments with regard to his failure or inadequacy claim, that claim will be dismissed without prejudice.

An appropriate order follows.

**BY THE COURT:**

**S/ WENDY BEETLESTONE**

_____

**WENDY BEETLESTONE, J.**